# CRIMINAL COMPLAINT

**ORIGINAL**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>WILLIAM CLOUD<br><br>Defendant. | DOCKET NO<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>JAN 11 2007<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY____ DEPUTY<br><br>MAGISTRATE'S CASE NO.<br>06-<br>**07-0022M** |

| Complaint for violation of Title 18, United States Code, Section 1341 ||||
|---|---|---|---|
| NAME OF MAGISTRATE JUDGE<br>Rosalyn M. Chapman | | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
| DATE OF OFFENSE<br>1999-July 2006 | PLACE OF OFFENSE<br>Los Angeles County<br>and elsewhere | ADDRESS OF ACCUSED (IF KNOWN) ||

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

   Beginning in or about 1999, and continuing to in or about July 2006, within the Central District of California and elsewhere, defendant WILLIAM CLOUD, together with others known and unknown, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victims as to a material matter, and to obtain money or property from such victims by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  In furtherance of the scheme, on or about March 25, 2002, defendant CLOUD mailed and caused to be mailed a letter to Paul C. Greven, in Murietta, California, purporting to be from The Shamrock Agency in Shannon, Ireland, which contained materially false and fraudulent pretenses, representations, promises, and  omissions.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
   (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT |
|---|---|
| | OFFICIAL TITLE<br>TIMOTHY NUGENT, Special Agent, IRS-CID |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | | DATE<br>January 11, 2007 |
|---|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54

EML
AUSA:EML:eml

REC:DETENTION (WARRANT)

AFFIDAVIT

I, Timothy Nugent, hereby depose and state as follows:

INTRODUCTION

1.    I am employed as a Special Agent (SA) with the Internal
Revenue Service's Criminal Investigation Division (IRS-CID), and
have been so employed since 1994.  Upon joining the IRS, I
received training in a wide array of criminal offenses at the
Federal Law Enforcement Training Center (FLETC) and the Federal
Bureau of Investigation Academy, including white collar offenses
such as mail fraud, wire fraud, money laundering and tax evasion.
I have also had specific training in the identification and
investigation of frauds involving elderly victims including
schemes known as Ponzi Schemes.  I have been involved in many
investigations of this type.  I have also been involved in more
than a hundred investigations of financial crimes.

PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a complaint and
arrest warrant against WILLIAM CLOUD ("CLOUD") for mail fraud, in
violation of Title 18, United States Code, Section 1341.

SUMMARY OF PROBABLE CAUSE

3.    As stated in the attached and incorporated affidavit
(see paragraph 5, below):   "Since approximately 2003, IRS-CID
and the United States Postal Inspection Service ("USPIS") have
been investigating Scott WALTHER (hereinafter, S WALTHER), his
father Henry WALTHER (hereinafter, H WALTHER), JANIS DESROSIERS

(hereinafter, DESROSIERS), William CLOUD (hereinafter, CLOUD),
Charles BLACK (hereinafter, BLACK), Mary MCRAE (hereinafter
MCRAE), and PJ SWINK (hereinafter, SWINK) (hereinafter
collectively referred to as "the conspirators"), relating to mail
fraud in violation of 18 USC § 1341, mailing of lottery materials
in violation of 18 USC § 1302, money laundering in violation of
18 USC § 1956, subscribing to a false tax return in violation of
26 USC § 7206(1), tax evasion, in violation of 26, USC § 7201,
and conspiracy, in violation of 18 USC § 371, for the time period
of 1999 to the present relating to a lottery Ponzi Scheme
involving the Fraudulent Lottery Companies, which I believe to be
permeated by fraud.  The scheme operates as follows:

"a.  The conspirators create and send tens of thousands
of solicitations offering increased chances of winning foreign
and domestic lotteries such as "The International Irish
Sweepstakes" (Irish Lottery), "The El Gordo" (Spanish Lottery),
"The Bunderschmidt" (German Lottery), "The NY Super 7" (New York
Lottery) and the "Triple Crown Lottery."  The solicitations claim
that the victims are purchasing "positions" in tickets to
lotteries that are grouped together or "pooled" to buy larger
blocks of the tickets.  Although the solicitations never
specifically promise winnings, they make claims that individuals
who had previously participated in their pool had won millions of
dollars.  The solicitations also make false statements regarding

2

the companies' backing by governmental and/or legitimate lottery entities.

"b.   The solicitations induce the victims to send in payments via checks, money orders, or credit card numbers.  The conspirators provide envelopes preaddressed to "mail drops") established by the conspirators in the Netherlands and Ireland. This mail is then forwarded back to the United States via Costa Rica and the Netherlands.

"c.   The victims' money is first deposited into accounts established by the conspirators at numerous banks in accounts with names that sound like official lotteries: SHAMROCK AGENCY, WORLD EXPERT, OLD AMSTERDAM, GERMAN SWISS, and EUC. (Hereinafter, accounts at this first layer will be referred to as "Lottery Accounts.") As set forth below, the conspirators have obtained nearly $14 million from thousands of victims into these accounts.

"d.   After the conspirators have deposited the victims' money into the Lottery Accounts, they transfer the money to the next layer of accounts, hereinafter referred to as "Payment Accounts."  These accounts are in names that include NORTH AMERICAN PAYMENT and EU PAYMENT SERVICE.  From the Payment Accounts, the conspirators write checks represented as winnings and send them back to the victims.  The amount of the alleged "winnings" is far less than the amount the victims send in.  My

3

investigation has revealed that no lottery tickets are ever purchased by the conspirators -- the "winnings" are actually paid out of money sent in by the victims.

"e.   The conspirators transfer some of the money from the Lottery Accounts and Payment Accounts to the next layer of accounts, which will hereinafter be referred to as "Bleed Accounts."  The conspirators write checks (or use wire transfers) from the Lottery Accounts and the Payment Accounts to the Bleed Accounts, which are in names that include WESTERN INTERNET, BUTTERFIELD, CARNEGIE and HENRY WALTHER ATTORNEY WIRE ACCOUNT. Money from the Bleed Accounts is used to continue the scheme by paying scheme expenses, as well as to provide benefits to the conspirators.  The conspirators also bleed money at each layer in the form of checks to cash, checks to themselves, or checks to the payment of personal or scheme expenses."

4.   Through my investigation to date, I have learned that the massive fraud scheme described in the attached and incorporated affidavit was controlled by Sonny Vleisides ("Vleisides"), James Ray Houston, aka Rex Rogers ("Houston"), and Dennis Emmett ("Emmett").  CLOUD managed portions of the scheme, including setting up and administering the mail drops in Ireland and the Netherlands, setting up mailing lists for victims, and handling victim money.  CLOUD currently resides in the Netherlands.

4

## PROCEDURAL HISTORY

5.   On June 30, 2006, the Honorable Suzanne H. Segal, United States Magistrate Judge, signed a warrant authorizing the search of the following locations:

a. The primary residence of S Walther ("S Walther") at 7217 Butte Ave, Goleta, California;

b. The primary business address for NORTH AMERICAN FOREIGN PAYMENT SERVICE, SHAMROCK AGENCY, WORLD EXPERT FUND, MUTUAL MEDICAL INSURANCE, HENRY WALTHER ATTORNEY et al., among others, at 2530 Wilshire Blvd, Floor 3, Santa Monica, California; and

c. The primary vehicle of S Walther.

The warrant and affidavit for 2530 Wilshire Boulevard, Floor 3, Santa Monica, California, are attached to this affidavit as Exhibit A, and are fully incorporated as if set forth herein.

6.   On July 5, 2006, in their respective jurisdictions, United States Magistrate Judges signed search warrants for the following locations:

a. The business address for EURO AMERICAN FAX CO, at 231 Maxham Rd, Suite 100, Austell, Georgia; and

b. The business location for WESTERN INTERNET SPECIALTY GROUP, CARNEGIE SCHOLARS INC, and ARTHUR T BUTTERFIELD & ASSOCIATES, at 4120 State Route K, West Plains, Missouri.

7.   On October 5, 2006 the Honorable Magistrate Judge Patrick J. Walsh signed arrest warrants for Vleisides and Houston in relation to their part in the mail and wire fraud scheme described in this affidavit.

<u>WITNESS INTERVIEWS</u>

8.   On October 10, 2006, I spoke with Mary McRae.  She informed me of the following:

a.   She worked for Euro American Fax Co. in Austell, Georgia, for nearly five years.  She was hired by CLOUD, who she knew was the owner of Euro American Fax Co.  McRae was responsible for inputting credit card charges from numbers provided to her via email by CLOUD.  She was told by CLOUD that these numbers were "plays" for lotteries.  Another part of her responsibilities included paying the expenses of Euro American Fax, which included wiring money to Michael Bolger in Ireland, who was part of CLOUD's lottery business.  She has also wired money to "Sonny" per CLOUD's instructions.  CLOUD also gave her instructions to send checks from Euro American Fax Co. to Hank, whose legal name is Henry Walther ("H Walther").  These checks were to be made payable to "Henry Walther Attorney at Law."  McRae believes the name World Expert is the name of one of the lotteries associated with CLOUD's business.  She knows CLOUD lives in Amsterdam where he owns a bar.

6

b.   During the interview with McRae, I showed her a printout of an email from "bill cloud" at slick930339@yahoo.com. She confirmed that this email was from CLOUD.  I spoke with McRae a second time on January 9, 2007, and she told me that CLOUD's email addresses were slick930339@yahoo.com and bill@atlasinformaticos.com.

9.   On October 10, 2006, I spoke with Charles Black, who leased an office to CLOUD at 231 Maxham Rd. in Austell, GA.  He began leasing to CLOUD two to five years before October 2006. Black said there was never a lease -- he just made a deal between CLOUD and himself to rent the space.  CLOUD and Black had known each other prior to the time CLOUD rented the space.

10.  I reviewed two translated reports of Interrogation completed by Brenda Amstelveen, a police officer in Amsterdam, in response to our request pursuant to a Mutual Legal Assistance Treaty related to the mailing addresses to which victims had sent money.

a.   The first report, of the interview of Bernhard van Kleef, was dated March 14, 2006.  In the report, van Kleef told Amstelveen that he rented a room to a man named Thomas McGovern. McGovern received mail there under the business name World Wide Expert.  He met McGovern through CLOUD, who owned a bar called Flying Dutchmen and also owned the business World Wide Expert.

7

Van Kleef also said that he worked for CLOUD as a chauffeur, picking up bags of mail which CLOUD took home and sorted.

b.   The second report was of the interview of William Finlayson, and was dated March 25, 2006.  In the report, Finlayson told Amstelveen that in 2001, CLOUD rented a postbox from him.  CLOUD told him that he had a business named World Wide Express or possibly Expert that had something to do with lotteries.  He explained that people sent CLOUD checks and he filed Lotto numbers.

11.  On July 6, 2006, I participated in the search at the location in West Plains, Missouri.  At that time, I interviewed PJ Swink ("Swink") and her husband, Michael Swink (hereinafter "M Swink").  They told me the following:

a.   Swink stated that her company, Western Internet, had worked for Vleisides and "Rex Rogers" (Houston) since 1993. The work, which was all related to the lottery, included printing as well as stuffing and mailing envelopes.  Swink was unaware of the exact name of the company, because it has had multiple names over the years.  Based on conversations and other communications with Vleisides over the years, she believes "The Shamrock Agency" and "World Expert" are companies related to Vleisides.  M Swink stated that Vleisides told him that Vleisides was a licensed broker for these companies in Europe.  Swink said that CLOUD is

8

Rex's brother and is involved in running the business with Vleisides, Rogers and Dennis Emmett.

      b.   I showed Swink samples of the solicitations described in paragraphs 12-19 of Exhibit A.  Swink identified the letters from RL Doorne and checks from Euro American as items she printed and prepared for mailings upon Vleisides' direction.  In addition to those samples, Swink identified jobs currently being prepared for the lottery business.  Samples of these were taken during the search warrant.  One such letter is titled "Pension Pool Forum" subtitled "Selected letters from various Gold Reserve Pension Pool members."  One of the letters reads   ". . . My reason for writing is simple, I love the pension pool and the security of being able to sleep at night knowing that my money is being protected against any outcome the financial world would care to push my way."

      c.   PJ Swink said that she was always reimbursed for work by either CLOUD or Henry Walther.

      d.   Vleisides sent Swink the printing directions for the mailings along with specific directions on how to mail the items.  Vleisides wanted mailings to be sent from larger towns, such as Little Rock, Arkansas, or St. Louis, Missouri, as opposed to a "rinky-dink" town like West Plains, Missouri.  Vleisides told Swink that if the solicitations were mailed from a larger city it increased the chance of the recipient opening the

envelope.  Swink was instructed to find someone to take the mail to these larger cities for postmark, and she hired Leslie Wilbanks to mail the solicitations.

       e.    Swink identified passbooks as those she purchased and printed labels for.  She said that she was instructed by Sonny Vleisidies to send these to customers.  They related to the lottery business.

    12.  On July 26, 2006, I spoke with Janis Des Rosiers.  She told me that she worked for H Walther beginning in 1998 and ending in 2002.  As part of her job, she opened bank accounts in the name of World Expert Fund and North American Foreign Payment at US Bank.  She knew that these accounts were being opened for H Walther's clients, who included "Dennis, Rex, Bill and Sonny."  She met these clients prior to 1998 during a trip to Costa Rica with H Walther, but did not know their last names.

    13.  On August 29, 2006, pursuant to a proffer agreement and in the presence of his attorney, I spoke with H Walther, who told me the following:

       a.  H Walther explained that the main people involved in the lottery were Houston, Vleisides, and Dennis Emmett.  The business started with Houston and Emmett.  Houston was the principal behind it.  CLOUD is Houston's brother or half-brother and currently resides in Amsterdam.

b.    For the last five to ten years, H Walther has been working as an accountant/banker and attorney for Vleisides and Houston, who he also knows as "Rex Vleisides" and "Rex Rogers." H Walther explained that Vleisides and Houston currently reside in Costa Rica.  H Walther explained that Houston and Vleisides operate a mail solicitation business involving foreign lotteries and horse racing.  Two of the companies they use are The Shamrock Agency and World Expert Fund.  Houston and Vleisides instructed H Walther to open and maintain bank accounts in the United States because the banking system was too slow in Costa Rica.

c.    H Walther explained that he received DHL and Federal Express packages full of checks from individuals that were sent from Costa Rica and Amsterdam.   The packages sent from Costa Rica were for Vleisides' business and from Amsterdam they related to Dennis Emmett's business.  The packages from Amsterdam came from CLOUD.  H Walther or his daughter Kristin Walther then deposited the checks into bank accounts in his name that he opened for Vleisides and Houston in the United States.  H Walther said he knew that these checks were from individuals playing the lottery.  As part of his responsibilities, he disbursed funds to people as instructed by Vleisides or Houston via wire transfers and checks from the accounts.  He also prepared daily balances taking into account deposits and disbursements.   Other disbursements for winners were made from accounts he and S

11

Walther established in the name of EU Payment and North American Payment.  These were used to pay winners of the lotteries.  These payments were for $3.00-$100, and once in a while as high as $250.  H Walther explained that the money for these payment accounts came from transfers made possible from the checks he had been sent from Amsterdam and Costa Rica.  As part of his job, he transferred money to his wire account which was used to wire money to Vleisides and Houston or others upon their direction.  H Walther stressed that the money in this account belonged to his clients, not him.  He also stated that some of the money he handled for the businesses went to CLOUD in Amsterdam.

        d.   H Walther also explained that as the attorney for World Expert and Shamrock Agency, he was instructed to respond to complaints from Attorney Generals Offices and customers.  He explained that these complaints first went to other countries and then he would be given a file to work.  H Walther said he was instructed to simply handle them and make them go away.  He usually handled them by giving the customers their money back.

        e.   I showed H Walther samples of solicitations I obtained from victims.  H Walther identified two specific solicitations as belonging to Vleisides.  Those included Old Amsterdam Trust and Mutual Medical Insurance Trust.

        f.   H Walther said he reviewed solicitation letters sent to him by Swink.  He believed the letters were legal because

the lotteries were overseas.  H Walther reviewed the letters and made allowances for sales-related exaggerations but noted no fraudulent statements in the letters.  Two letters that H Walther was shown from the Swink file were in relation to the German Lottery.  One letter stated "For the first time in German History, the German Lottery Commission Trust has decided to sponsor a lottery cash rebate program…GERMAN GOVERNMENT WANTS TO HELP MAKE YOU MY FUTURE WINNER!. . .  With such a positive turnover, even under the worst conditions, <u>you are almost guaranteed to win money</u>    . . .  Warmest regards R.L. DOORNE." Attached to the letter is what appears to be a check but above the attachment is the phrase "Do not deposit this check in an American bank.  The rules of this promotional cash award require you to endorse the check and include it with the balance of $27.82." Another letter reads "As a US CLAIMANT your quick action has brought you this UNCLAIMED PRIZE check for $10 dollars..." Attached at the bottom is what appears to be check but is not. In small letters is the phrase "Do not deposit in an American bank."

  g.   When asked whether the lottery resembled a Ponzi scheme, because the victims were being paid with checks from an account into which only victim money was transferred, H Walther said he did not know that there was not money coming into bank accounts he did not control from lottery winnings.  When asked

about the money going into supposed pension funds, H Walther said he believes there is money out there, maybe, which may have been vested in a mutual pension pool.

14.  On September 13, 2006, I spoke with Glenda Emmett, who told me the following information:

a.  Emmett is the owner of Astro Computer, which operates a mail list business.  This includes maintaining lists and preparing the letters to be mailed out by a mail house.

b.  For the past five or six years, her only customer was Global Search Network, which was run by her ex-husband, Dennis Emmett.  Dennis Emmett is now in prison in Costa Rica for murder, but was still issuing instructions to her from prison. Before she worked for Global Search Network, she worked for World Expert Fund.  That company was owned by Vleisides.  Her ex-husband, Dennis Emmett, worked with World Expert Fund for some time in Costa Rica.

c.  H Walther was also involved with World Expert Fund.

d.  Emmett explained that responses to the solicitations are sent from Amsterdam.  After being sent to Amsterdam, checks sent in response to the solicitations are sent to H Walther.  She said that CLOUD is the contact person in Amsterdam.

14

<u>EXAMPLES OF EVIDENCE SEIZED FROM WARRANTS</u>

15.  On July 6, 2006, the search warrants at the addresses listed above in paragraphs 3 and 4 of this affidavit were executed.  At that time, a supplemental warrant was obtained and executed on a storage space at 2530 Wilshire Boulevard.

16.  The searches yielded the following evidence, as well as other information:

a.   7217 Butte Ave, Goleta, California.  SA Finney with the IRS-CID, who is trained in computer forensics, completed an analysis of the computers found at the Butte Avenue location, which was S Walther's residence.  On the computers he found documents and emails involving the scheme.  SA Finney provided me with some of these records which I reviewed.  I saw word processing documents that related to the scheme as well as emails between Vleisides and H Walther and S Walther.  Some of the emails were addressed to "Bill" or "Bill Cloud" with an email of bill@atlasinformaticos.com.  Specific examples of documents and emails that included CLOUD as an addressee are as follows:

i.   On May 12, 2002 "Sonny" wrote: "Hi guys, I would like to clear up some misunderstandings that Rex may have created.  First of all, no one is stealing the business or cutting Rex out.  What we are doing is ensuring once and for all the company's bills are paid before Rex receives his profits.  This had to be done to save the company. . . .  Within the last

15

few months, Rex's demands on Bill became too much to bear so bill closed his accounts.   Rex then moved to get control of Hanks banking flow by convincing me that he wanted to come back to the lottery business . . . ." Later in the email Sonny writes: "Well, the only money in the system is the systems' operating capital- and that's what Rex wanted.   For those of you who may not know, that would force a full and complete insolvency of the company within 30 days.   Any break in the operating capital and the whole structure comes tumbling down."

      ii.   On August 22, 2002, a person named Susan Fonseca with an email address of susan@atlasinformaticos.com sent an email to Henry W Walther, with a "cc" to "Bill Cloud" and Sonny Vleisides.   In the thread of the email "Hank" writes regarding a complaint letter from Dorothy Larson about one of the lottery companies called Old Amsterdam Pension and Trust.   The email says ". . . she sent her Old Amsterdam Trust Account Passbook with a communication, probably to Amsterdam, and has not received it back. . . .   She thinks she sent it to the bank, and believes that Old Amsterdam is a bank. . .   Bill says it probable went to CR [Costa Rica] . . . .   So before this takes any more time and builds any more or of a written records, send the lady a replacement Trust Account Passbook. . . ."

     b.   2530 Wilshire Boulevard, Floor 3, Santa Monica, California.   I reviewed the evidence obtained from the search

warrant completed at this address, which is H Walther's office.
I also reviewed the records SA Finney found as a result of his
computer forensic analysis at this address.  Specific examples of
the evidence found at this location are as follows:

    i.   A blue folder labeled "Outgoing Wire Transfer
Forms" from the Henry W Walther Wire Account, account
#XXXXXXXX3928 containing four paper-clipped piles of wire
transfer record copies.  A memo is attached to each pile.  They
read "Dennis Pile" "Sonny's Forms", "Bill Pile" and "Rex Pile."

    ii.  A printout of an email dated June 3, 2002, from
"bill" with an email address of bill@atlasinformaticos.com  to
"hank" with an email address of greenfish@earhtlink.net (which I
know to be the email address of H Walther).  The email says
"SENDING TO NAFPS----10,000 TODAY".  Based on my training and
knowledge of the case I believe that NAFPS stands for the payment
account North American Foreign Payment Service, and this email
indicates that a wire or another money transfer is being sent to
the North American Foreign Payment Services account.

    iii. A printout of an email dated July 23, 2002, from
Henry W Walther to "bill cloud" at the an email address of
slick930339@yahoo.com.  The email reads "Dear Uncle Bill: Got the
information and will email or call to discuss before sending
anything. Hank"   In the prior thread of discussion the email
reads "bill cloud wrote: HANK WIRING INFRO FOR UNCLE BILL" and

listed below are account name and numbers including: Paula Hays
Kelly (who I know to be CLOUD's wife), World Wide Expert, CLOUD,
and Mary McRae.    The end of the email reads "HANK BEFORE YOU SEND
ANY OVERSEAS WIRES WE SHOULD GO OVER THEM ON THE PHONE FIRST,
UNCLE BILL."

    c.    231 Maxham Road, Austell, Georgia.  I reviewed the
evidence obtained from the search warrant completed at this
location, which is a space rented by CLOUD.  Relevant evidence
included the following:

    i.    Tens of thousands of credit card "Mail Order
Forms" that listed names and credit card numbers.  On the bottom
of many of the forms was "Euro American."

    ii.    Pages of email printouts in 2003, 2004, 2005, and
2006 listing credit card numbers with names and amounts from
bill@atlasinformacticos.com and slick930339@yahoo.com.    Above
the list of credit card numbers are initials like "GSN" (which I
believe to be Global Search Network) and "WEF" (which I believe
to be World Expert Fund).

    iii. UPS bills and credit card bills addressed to CLOUD
and Euro American Fax Co.

    iv.    Western Union receipts for money wired by McRae,
in Georgia, USA to "Sonny Velisides" in Costa Rica.  The dates
and amounts are as follows: 8/11/04-$2200, 8/5/04-$1200, 7/9/04-
3300, 7/2/04- $2000, and 6/24/04-$2000.

v. A DHL package dated August 26, 2004 sent from Atlas Informaticos in Costa Rica to Mary Mcrae at 376-A Mqxham [sic] Rd, PMB 1603, Austell, GA. Inside the package were numerous completed "Mail Order Request Forms" containing authorizations to charge credit cards. Included on the forms is the name of a victim, the amount to be charged, and the credit card number. The bottom of the slip states "This charge will appear on your bill as: EURO AMERICAN." These forms were banded in eleven separate piles that were totaled with memo notes attached. The notes had totals and batch dates in addition to phrases like "WEF Amsterdam" and "WEF New York."

vi. A DHL package dated September 21, 2004, sent from Atlas Informaticos in Costa Rica to Mary Mcrae at 376-A Mqxham [sic] Rd, PMB 1603, Austell, GA. Inside the package were numerous completed "Mail Order Request Forms" containing authorizations to charge credit cards, and described above. These forms were banded in eight separate piles that were totaled with memo notes attached. The notes had totals and batch dates in addition to phrases like "WEF Amsterdam."

d. 4120 State Route K, West Plains, Missouri. I reviewed the evidence obtained from the search warrant completed at this location, which was the mass mailing center run by Swink and M Swink. Specific examples of evidence found at the location are as follows:

19

       i.   Printouts of instructions for how to print and prepare solicitations for mailing.  These instructions had titles including "Irish Sweepstakes", "El G Payout", "Bundershmidt", "Medical Dividends Payout" and "RL Doorner".  Some of the instructions had comments like "make sure the seal is prominent so that it can be seen."

       ii.  An email dated 6/12/01 to "rexx. Et al" with an email address of rex@lfcity.org from William C with an email address of williamc@lfcity.com.  The email states "Here are two set's addresses that will rotate every 6 weeks."  The addresses are all in Amsterdam.  I know that at least three of the addresses on the sheet were the same as addresses on return envelopes provided with solicitations for the lotteries.  I believe all of these addresses were used as foreign mail drops to collect victim money.

       iii. Solicitations to thousands of individuals all over the United States.  These solicitations were in various stages of completion.  Samples were taken of the solicitations.  They had names including Irish Sweepstakes, El Gordo Lottery, and Old Amsterdam Trust.

<u>BANK RECORDS</u>

17.  I reviewed additional bank records for the Euro American Fax bank account at Georgia State Bank, account #XXX6927.  I saw that the account was opened by CLOUD and McRae

on July 23, 2003.  In the account were regular and frequent electronic deposits totaling over $1,000,000 from credit card merchant processing companies, which I believe represent victim funds.  I also saw nine checks made payable to cash, with dates from April 2004 through August 2004, that had "Sonny" written in the memo section.  The nine checks for this four-month period totaled $16,565.  Other checks included nearly $200,000 made payable to the Henry Walther Wire Attorney Wire Account.  These checks appear to be signed by CLOUD.

18.  I reviewed additional bank records for the Henry Walther Wire account at US Bank, account #XXXXXXXX3928.  I saw regular wires, in amounts ranging from $7,500 to $9,500, being sent to a bank account in Amsterdam in the name of CLOUD. *I also reviewed bank records for Wells Fargo Account xxxxxx1685 in the name of Shamrock Agency,*

## MAIL FRAUD COUNT

*11.12.07*

19.  Beginning in or about 1999, and continuing to at least in or about July 2006, within the Central District of California and elsewhere, defendant WILLIAM CLOUD, together with others known and unknown, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victims as to a material matter, and to obtain money or property from such victims by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  In furtherance of the scheme, on or about March 25, 2002, defendant CLOUD mailed and caused to be mailed a letter to Paul

21

*(continued)*
*and I saw as part of a deposit on June 1, 2001 two checks from Paul Greven payable to Euro American.*

*1/11/2007*

C. Greven, in Murietta, California, purporting to be from The
Shamrock Agency in Shannon, Ireland, which contained materially
false and fraudulent pretenses, representations, promises, and
omissions.

<u>CONCLUSION</u>

20.   Based upon the facts set forth above, I believe there
is probable cause to believe that WILLIAM CLOUD has committed
mail fraud, in violation of 18 U.S.C. § 1341.

TIMOTHY NUGENT
Special Agent, IRS-CID

Sworn and subscribed to
before me on this _11th_ day
of January, 2007.

UNITED STATES MAGISTRATE JUDGE

22

## AFFIDAVIT FOR SEARCH WARRANT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>THE PREMISES KNOWN AS:<br>2530 Wilshire Boulevard, Floor 3<br>Santa Monica, California | DOCKET NO.    MAGISTRATE CASE NO.<br>06-1209<br><br>NAME AND ADDRESS OF JUDGE 1 OR U.S. MAGISTRATE JUDGE<br><br>HONORABLE SUZANNE H. SEGAL<br>United States Magistrate Judge<br>Los Angeles, California |

The undersigned being duly sworn deposes and says:  That there is reason to believe that

| ☐ on the person of  ☒ on the premises known as | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

### SEE ATTACHMENT A

```
                        FILED
        CLERK, U.S. DISTRICT COURT

              JUN 3 0 2006

        CENTRAL DISTRICT OF CALIFORNIA
        BY                    DEPUTY
```

The following property (or person) is concealed:

### SEE ATTACHMENT B

Affiant alleges the following grounds for search and seizure 2

**Evidence of violations of Title 18, United States Code, Sections 1302, 1341, 1956, and Title 26, United States Code, Section 7206(1).**

☒ See attached affidavit which is incorporated as part of this affidavit for search warrant

Affiant states the following facts establishing the foregoing grounds for issuance of a Search Warrant

**(SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED AS PART OF THIS AFFIDAVIT FOR SEARCH WARRANT)**

| SIGNATURE OF AFFIANT<br><br>TIMOTHY NUGENT | OFFICIAL TITLE, IF ANY<br>SPECIAL AGENT<br>INTERNAL REVENUE SERVICE - CRIMINAL INVESTIGATION DIVISION (IRS-CID) |
|---|---|

Sworn to before me, and subscribed in my presence:

| DATE<br>June 30, 2006 | JUDGE OR US MAGISTRATE JUDGE SEGAL<br>SUZANNE H. SEGAL |
|---|---|

1 United States Judge or Judge of a State Court of Record

2 If a search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure 41(c), show reasonable cause therefor.

EXHIBIT
A

EML-bt  GTL

## ATTACHMENT A

The primary business address for, among others entities, NORTH AMERICAN FOREIGN PAYMENT SERVICE, SHAMROCK AGENCY, WORLD EXPERT FUND, MUTUAL MEDICAL INSURANCE, and HENRY WALTHER ATTORNEY, located at 2530 Wilshire Blvd #3, Santa Monica, California.  This location is also the listed address for the law firm of Deering, Walther and Sands.  The site is a three story office building located on the corner of 26th and Wilshire.  The bottom floor is a Verizon Store with access from the street, but the upper floors are accessed through a public lobby with elevators.  The entire third floor is the premises to be searched.  On the third floor, there is large fish tank directly in front of the elevator.  Leaving the elevator, the only way to turn is left, where a receptionist's desk is sitting.  Behind the desk are offices.

The search shall not include the personal, separate offices of attorneys Deering and Sands. The search shall not include files or cabinets that pertain solely to Deering and Sands' Clients. SIIS

ATTACHMENT B

The items to be seized are evidence of violations of Title 18, United States Code, Section 1341 (Mail fraud); Title 18 United States Code Section 1302 (Mailing lottery related material); Title 18, United State Codes, Section 1956 (Money Laundering); Title 18, United States Codes, Section 371 (Conspiracy); Title 26, United States Code, Section 7201 (Tax Evasion); and Title 26, United States Code, Section 7206(1) (Subscribing to a tax false return), further described as follows: Documents created, dated, modified, or filed during the period January 1, 1999, through the present that pertain to SHAMROCK AGENCY, GERMAN SWISS GROUP, WORLD EXPERT FUND, MUTUAL MEDICAL INSURANCE CO, OLD AMSTERDAM TRUST CO, EURO AMERICAN FAX CO, EUROPEAN UNION COMMISSION, EU AMERICAN PAYMENT CO, GLOBAL SEARCH NETWORK, NORTH AMERICAN FOREIGN PAYMENTS SERVICES, WESTERN INTERNET SPECIALTY GROUP, ARTHUR T BUTTERFIELD AND ASSOCIATES, CARNEGIE SCHOLARS INC., HENRY WALTHER ATTORNEY WIRE ACCOUNT, LAISSEZ FAIRE CITY, WORLDWIDE VERIFICATION SERVICES, WWW WEBPAY and OGDB (collectively, the "Fraudulent Lottery Companies"), consisting of any of the following:

Customer lists, rolodex cards, address books, correspondence to and from customers or prospective customers, and customer files that reflect transactions with the above-mentioned entities, employees and individuals;

All notes, internal and external correspondence with customers, tape/audio recordings of conversations and communications with employees or affiliates including telephone records, fax records, telephone service orders and telephone bills;

Sales manuals, audio/video tapes, brochures, pitch sheets, and lead source materials, including index cards, mailers, and professional lead sheets with names, client books, addresses and telephone numbers of prospective clients, and other materials promoting the conduct of the business;

Personnel and pay records identifying current and former employees, affiliates and principals, including employment contracts and records that indicate the employee code numbers, licenses they may have, and fictitious names used by such principals, affiliates, and employees;

Reports, data, contracts, and agreements concerning the securing or the retention of professional office services, private mail services and storage units;

Correspondence or notes to, from, or involving the entities listed above;

Bank and financial institution statements, trust account statements, safety deposit box records, cashiers checks, personal checks, canceled checks, money orders, check ledgers, deposit slips, deposited items, records of wire transfers, Cash Transaction Reports, certificates of deposit, check books, endorsement stamps, and related bank and financial institution information reflecting receipt or disbursement of funds;

Brief cases, locking containers, satchel bags or similar containers that might be used to store business supplies, records, or funds;

Business licenses, fictitious business name certificates, stock books, Articles of Incorporation, and bylaws for the Fraudulent Lottery Companies, business cards, diaries, appointment books, desk calendars, books, and records containing telephone numbers and addresses, rental or lease agreements, and other documents that show the identity of the owners, principals, employees and affiliates of the entities named above;

Records, documents, files, and/or programs, relating to the personal taxes of SCOTT WALTHER, including IRS forms 1040 and related schedules, W-2, 1099, 1098, and documents used to support the tax returns, including bank records, receipts/proof of expenditures, financial statements, and records of gross receipts and expenses;

Correspondence, contracts, and agreements regarding records and documents of mailings, shipping or delivery, whether by the United States Postal Service or other delivery services, including, but not limited to, receipts, invoices, and packing lists;

Records, documents, files, programs, and other materials relating to the control of the locations to be searched;

Currency on hand of greater value than $5,000;

Financial Statements, including profit and loss statements, balance sheets, income statements, payments ledgers, accounting records, bank reconciliations, trial balances, and tax returns, and notes, drafts, and calculations reflecting the preparation of the aforementioned items;
Documents and other items reflecting the shipping/mailing of solicitation letters, including envelopes;

Documents and other items reflecting the establishment of post

office boxes or the use of mail forwarders in Ireland, the
Netherlands, or elsewhere, including faxes, applications, notes
and correspondence;

Credit charge slips, merchant statements, and other records
indicating the charging of credit cards;

Lists of victim names and addresses;

Drafts/notes of solicitation letters and items used to create
such letters or drafts;

Airline tickets, lodging receipts and other indicia showing
travel abroad;

Birth certificates and/or other documents proving birth and
date of birth.

As used above, the terms records, documents, programs, and
materials include records, documents, programs, and materials
created, modified or stored in any form.  The term "and" includes
both the conjunctive and the disjunctive.

# A F F I D A V I T

I, Timothy Nugent, being duly sworn, hereby declare and state:

INTRODUCTION

1.   I am employed as a Special Agent (SA) with the Internal Revenue Service's Criminal Investigation Division (IRS-CID), and have been so employed since 1994.  Upon joining the IRS, I received training in a wide array of criminal offenses at the Federal Law Enforcement Training Center (FLETC) and the Federal Bureau of Investigation Academy, including white collar offenses such as mail fraud, wire fraud, money laundering and tax evasion. I have also had specific training in the identification and investigation of frauds involving elderly victims including schemes known as Ponzi Schemes.  I have been involved in many investigations of this type.  I have also been involved in more than a hundred investigations of financial crimes.

2.   This affidavit is made in support of an application for warrants authorizing the search of:

a.   The primary residence of SCOTT WALTHER at 7217 Butte Ave, Goleta, California (**LOCATION 1**);

b.   The primary business address for NORTH AMERICAN FOREIGN PAYMENT SERVICE, SHAMROCK AGENCY, WORLD EXPERT FUND, MUTUAL MEDICAL INSURANCE, HENRY WALTHER ATTORNEY et al., among others, at 2530 Wilshire Blvd, Floor 3, Santa Monica, California (**LOCATION 2**); and

c.   The primary vehicle of SCOTT WALTHER (**LOCATION 5**).

3.   This affidavit is also being used in the relevant jurisdictions in support of applications for warrants authorizing the search of:

a.   The business address for EURO AMERICAN FAX CO, at 231 Maxham Rd, Suite 100, Austell, Georgia (**LOCATION 3**); and

b.   The business location for WESTERN INTERNET SPECIALTY GROUP, CARNEGIE SCHOLARS INC, and ARTHUR T BUTTERFIELD & ASSOCIATES, at 4120 State Route K, West Plains, Missouri (**LOCATION 4**).

4.   The information contained within this affidavit is based upon my training and experience, my personal knowledge of the investigation conducted in this matter, information and expertise provided by other agents who have assisted in this investigation, and my examination of evidence collected to date. This affidavit is intended to provide probable cause to support the issuance of the search warrants as requested herein and does not purport to set forth all of the information that I have acquired during the course of this investigation.

PREMISES TO BE SEARCHED

5.   The premises to be searched are further described as follows:

a.   **LOCATION 1** is the primary residence of SCOTT WALTHER, at 7217 Butte Ave, Goleta, California.  The physical

2

address of 7217 Butte Ave, Goleta, California, is further described as a cream colored, two story, wood residence with blue trim.  The house is in an L configuration with the front door in the corner.  Above the one-car garage are two windows.  The address on the house is located directly next to the front door facing the street.  The house is the next house up from the corner of Butte and Alameda.

b.   **LOCATION 2** is the primary business address for multiple businesses involved in this fraud scheme located at 2530 Wilshire Blvd #3, Santa Monica, California.  Those businesses include, among others, NORTH AMERICAN FOREIGN PAYMENT SERVICE, SHAMROCK AGENCY, WORLD EXPERT FUND, MUTUAL MEDICAL INSURANCE, and HENRY WALTHER ATTORNEY.  This location is also the listed address for the law firm of Deering, Walther and Sands.  The site is a three story office building located on the corner of 26th and Wilshire.  The bottom floor is a Verizon Store with access from the street, but the upper floors are accessed through a public lobby with elevators.  The entire third floor is the premises to be searched.  On the third floor, there is large fish tank directly in front of the elevator.  Leaving the elevator, the only way to turn is left, where a receptionist's desk is sitting. Behind the desk are offices.

c.   **LOCATION 3** is the primary business address for EURO AMERICAN FAX CO.  This address is 231 Maxham Rd, Suite 100,

3

Austell, Georgia.   The premises are further described as follows:
231 Maxham Road is a brown commercial business located on Maxham
Road in Austell, Georgia.   The building consists of tan colored
cinder blocks with a brown trim.   The entrance to Suite 100 is
marked with gold stenciling on the glass entrance door.   Also on
the door is the name Charles Black in gold letters.   Facing the
building, Suite 100 is the second door from the left under a
large overhang. Facing the street in front of the building is a
large sign showing the address of 231.   Listed on the sign is
Charles C. Black Attorney at Law.

      d.   **LOCATION 4** is the primary business address for
three companies involved in this fraud scheme at 4120 State Route
K, West Plains, Missouri.   The companies are WESTERN INTERNET
SPECIALTY GROUP, CARNEGIE SCHOLARS INC, and ARTHUR T BUTTERFIELD
AND ASSOCIATES.   This site is in a rural residential area.   Next
to the entrance to the driveway is a large sign that reads "TACK
STORE" along with Blacksmith Printing.   The dirt driveway is
accessed through a metal gate.   A long circular dirt driveway off
State Route K leads to an L shaped home.   The home is greenish
and white.   In front of the house is a dirt area for parking.   A
ramp made of wood leads up to the front door.   The house has a
green roof.   A two car garage faces State Route K.

      e.   **LOCATION 5** is the registered vehicle for SCOTT
WALTHER.   The vehicle is a grey colored GMC Yukon sports utility

vehicle.  The California license plate is 4DHY675, and the vehicle identification number is 1GKEK13R3XJ729912.

COMPUTER DATA

6.  Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.  Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.  Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased,

5

compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

      c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers.  Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

      d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of

methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

<u>ITEMS TO BE SEIZED</u>

7.   The items to be seized are evidence of violations of Title 18, United States Code, Section 1341 (Mail fraud); Title 18 United States Code Section 1302 (Mailing lottery related material); Title 18, United State Code, Section 1956 (Money Laundering); Title 18, United States Code, Section 371 (Conspiracy); Title 26, United States Code, Section 7201 (Tax Evasion); and Title 26, United States Code, Section 7206(1) (Subscribing to a tax false return), further described as

follows: Documents created, dated, modified, or filed during the period January 1, 1999, through the present that pertain to SHAMROCK AGENCY, GERMAN SWISS GROUP, WORLD EXPERT FUND, MUTUAL MEDICAL INSURANCE CO, OLD AMSTERDAM TRUST CO, EURO AMERICAN FAX CO, EUROPEAN UNION COMMISSION, EU AMERICAN PAYMENT CO, GLOBAL SEARCH NETWORK, NORTH AMERICAN FOREIGN PAYMENTS SERVICES, WESTERN INTERNET SPECIALTY GROUP, ARTHUR T BUTTERFIELD AND ASSOCIATES, CARNEGIE SCHOLARS INC., HENRY WALTHER ATTORNEY WIRE ACCOUNT, LAISSEZ FAIRE CITY, WORLDWIDE VERIFICATION SERVICES, WWW WEBPAY and OGDB (collectively, the "Fraudulent Lottery Companies"), consisting of any of the following:

    a.   Customer lists, rolodex cards, address books, correspondence to and from customers or prospective customers, and customer files that reflect transactions with the above-mentioned entities, employees and individuals;

    b.   All notes, internal and external correspondence with customers, tape/audio recordings of conversations and communications with employees or affiliates including telephone records, fax records, telephone service orders and telephone bills;

    c.   Sales manuals, audio/video tapes, brochures, pitch sheets, and lead source materials, including index cards, mailers, and professional lead sheets with names, client books, addresses and telephone numbers of prospective clients, and other

8

materials promoting the conduct of the business;

d.    Personnel and pay records identifying current and former employees, affiliates and principals, including employment contracts and records that indicate the employee code numbers, licenses they may have, and fictitious names used by such principals, affiliates, and employees;

e.    Reports, data, contracts, and agreements concerning the securing or the retention of professional office services, private mail services and storage units;

f.    Correspondence or notes to, from, or involving the entities listed above;

g.    Bank and financial institution statements, trust account statements, safety deposit box records, cashiers checks, personal checks, canceled checks, money orders, check ledgers, deposit slips, deposited items, records of wire transfers, Cash Transaction Reports, certificates of deposit, check books, endorsement stamps, and related bank and financial institution information reflecting receipt or disbursement of funds;

h.    Brief cases, locking containers, satchel bags or similar containers that might be used to store business supplies, records, or funds;

i.    Business licenses, fictitious business name certificates, stock books, Articles of Incorporation, and bylaws for the Fraudulent Lottery Companies, business cards, diaries,

9

appointment books, desk calendars, books, and records containing telephone numbers and addresses, rental or lease agreements, and other documents that show the identity of the owners, principals, employees and affiliates of the entities named above;

j.   Records, documents, files, and/or programs, relating to the personal taxes of SCOTT WALTHER, including IRS forms 1040 and related schedules, W-2, 1099, 1098, and documents used to support the tax returns, including bank records, receipts/proof of expenditures, financial statements, and records of gross receipts and expenses;

k.   Correspondence, contracts, and agreements regarding records and documents of mailings, shipping or delivery, whether by the United States Postal Service or other delivery services, including, but not limited to, receipts, invoices, and packing lists.

l.   Records, documents, files, programs, and other materials relating to the control of the locations to be searched;

m.   Currency on hand of greater value than $5,000;

n.   Financial Statements, including profit and loss statements, balance sheets, income statements, payments ledgers, accounting records, bank reconciliations, trial balances, and tax returns, and notes, drafts, and calculations reflecting the preparation of the aforementioned items;

10

   o. Documents and other items reflecting the shipping/mailing of solicitation letters, including envelopes;

   p. Documents and other items reflecting the establishment of post office boxes or the use of mail forwarders in Ireland, the Netherlands, or elsewhere, including faxes, applications, notes and correspondence;

   q. Credit charge slips, merchant statements, and other records indicating the charging of credit cards;

   r. Lists of victim names and addresses;

   s. Drafts/notes of solicitation letters and items used to create such letters or drafts;

   t. Airline tickets, lodging receipts and other indicia showing travel abroad;

   u. Birth certificates and/or other documents proving birth and date of birth.

  8. As used above, the terms records, documents, programs, and materials include records, documents, programs, and materials created, modified or stored in any form.  The term "and" includes both the conjunctive and the disjunctive.

  9. In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

   a. Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the

"computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b.    If the computer personnel determine it is not practical to perform an on-site search of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

c.    In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

d.    If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time not to

12

exceed 60 days from the date of execution of the warrant.  If the government needs additional time to determine whether the data falls within any of the items to be seized pursuant to this warrant, it must obtain an extension of the time period from the Court within the original sixty day period.

10.  In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

a.  Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

b.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment,

13

storage devices or software.

      e.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

      f.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

      g.   Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

<u>OVERVIEW OF FRAUDULENT SCHEME</u>

      11.   Since approximately 2003, IRS-CID and the United States Postal Inspection Service ("USPIS") have been investigating Scott WALTHER (hereinafter, S WALTHER), his father Henry WALTHER (hereinafter, H WALTHER), JANIS DESROSIERS (hereinafter, DESROSIERS), William CLOUD (hereinafter, CLOUD), Charles BLACK (hereinafter, BLACK), Mary MCRAE (hereinafter MCRAE), and PJ SWINK (hereinafter, SWINK) (hereinafter collectively referred to as "the conspirators"), relating to mail fraud in violation of 18 USC § 1341, mailing of lottery materials in violation of 18 USC § 1302, money laundering in violation of 18 USC § 1956, subscribing to a false tax return in violation of 26 USC § 7206(1), tax evasion, in violation of 26, USC § 7201, and conspiracy, in

14

violation of 18 USC § 371, for the time period of 1999 to the present relating to a lottery Ponzi Scheme involving the Fraudulent Lottery Companies, which I believe to be permeated by fraud. The scheme operates as follows:

a.   The conspirators create and send tens of thousands of solicitations offering increased chances of winning foreign and domestic lotteries such as "The International Irish Sweepstakes" (Irish Lottery), "The El Gordo" (Spanish Lottery), "The Bunderschmidt" (German Lottery), "The NY Super 7" (New York Lottery) and the "Triple Crown Lottery." The solicitations claim that the victims are purchasing "positions" in tickets to lotteries that are grouped together or "pooled" to buy larger blocks of the tickets. Although the solicitations never specifically promise winnings, they make claims that individuals who had previously participated in their pool had won millions of dollars. The solicitations also make false statements regarding the companies' backing by governmental and/or legitimate lottery entities.

b.   The solicitations induce the victims to send in payments via checks, money orders, or credit card numbers. The conspirators provide envelopes preaddressed to commercial mail receiving agencies ("mail drops") established by the conspirators in the Netherlands and Ireland. This mail is then forwarded back to the United States.

15

c.   The victims' money is first deposited into accounts established by the conspirators at numerous banks in accounts with names that sound like official lotteries: SHAMROCK AGENCY, WORLD EXPERT, OLD AMSTERDAM, GERMAN SWISS, and EUC. (Hereinafter, accounts at this first layer will be referred to as "Lottery Accounts.") As set forth below, the conspirators have obtained nearly $14 million from thousands of victims into these accounts.

d.   After the conspirators have deposited the victims' money into the Lottery Accounts, they transfer the money to the next layer of accounts, hereinafter referred to as "Payment Accounts."   These accounts are in names that include NORTH AMERICAN PAYMENT and EU PAYMENT SERVICE.   From the Payment Accounts, the conspirators write checks represented as winnings and send them back to the victims.   The amount of the alleged "winnings" is far less than the amount the victims send in.   My investigation has revealed that no lottery tickets are ever purchased by the conspirators -- the "winnings" are actually paid out of money sent in by the victims.

e.   The conspirators transfer some of the money from the Lottery Accounts and Payment Accounts to the next layer of accounts, which will hereinafter be referred to as "Bleed Accounts."   The conspirators write checks (or use wire transfers) from the Lottery Accounts and the Payment Accounts to the Bleed

16

Accounts, which are in names that include WESTERN INTERNET,
BUTTERFIELD, CARNEGIE and HENRY WALTHER ATTORNEY WIRE ACCOUNT.
Money from the Bleed Accounts is used to continue the scheme by
paying scheme expenses, as well as to provide benefits to the
conspirators.  The conspirators also bleed money at each layer in
the form of checks to cash, checks to themselves, or checks to
the payment of personal or scheme expenses.

      f.   From my training and experience, I believe the
conspirators are operating a classic Ponzi scheme.  From my
experience, I know that as a Ponzi scheme progresses and money is
bled out of the pool, more victims are needed in order to keep
the scheme going.  Because victims begin to realize they do not
get more than they put into a Ponzi scheme, the schemers
recontact the victims using different company names and
variations of solicitations so that the victims do not recognize
that they are being recontacted by the same companies and/or
individuals.  Moreover, a Ponzi scheme continually seeks to add
victims through regular mass mailings.  Eventually a Ponzi scheme
collapses when the new and old victims stop sending money.  At
this point the schemers generally shut down companies and bank
accounts.

## The Investigation

### Victim Statements

    12.  On August 15 and 18, 2003, I spoke with Amy Von

17

Freyman, who told me that her grandfather, Clarence Enge, who is in his 80s, was receiving letters via the United States mail from companies soliciting his participation in foreign lotteries. Since 1997, Enge has sent $600-$1200/month to such companies, including to OLD AMSTERDAM and SHAMROCK AGENCY. In order to continue his participation he has refinanced his home. Von Freyman also said that she had at least 45 unopened letters that had been mailed to her grandfather from companies including WORLD EXPERT and SHAMROCK AGENCY.

13. I reviewed these letters, which were given to me by Von Freyman. I saw that these letters were addressed to Clarence Enge from "World Expert-Licensed Agent" (no return address), "The Shamrock Agency" with a return address of "C12 Smithson Industrial, Estate Shannon Co Clare, Rep of Ireland" and "Global Search Network, c/o Inter-European Insured Delivery." The mailings were sent to Enge via the US Mail using regular first class stamps. The postmarks on the envelopes had dates ranging between 1998-2003, from Little Rock, Arkansas, and St. Louis and Kansas City, Missouri.

14. One letter from World Expert Fund-Licensed Agent, addressed to Enge, was postmarked from Little Rock, Arkansas, dated "13 Jun 2002." The envelope contained the following:

a. A colorful solicitation for "The Giant Bunderschmidt," which contained phrases like:

18

I.    "Almost every third number wins in the 8th annual Bunderschmidt European Lottery Marathon."

ii.    "Win big with as little as 1 a week!"

iii.    "A grand total of $251,548,908 in prizes. Add to this all the promotional prizes involved, and you have an unprecedented Quarter Billion Dollar European lottery bonanza."

iv.    "A full 30% of all tickets will win!"

v.    "Official European Lottery."

vi.    "WORLD EXPERT FUND-BERLIN GERMANY Bunderschmidt-Licensed Agent"

vii. "Make checks payable to World Expert Fund."

b.    Also included were two "official receipts" for the "Euro Cities Capital 7 game."  This official receipt provides a "ticket ID number" and states that: "This is your official receipt for 30 consecutive days in the Euro-Cities Capital 7 game.  Your numbers are shown in the windows above.  Prizes will be paid in US dollars and checks will be mailed to you within 10 days by the licensed agent drawn on a U.S. Bank."  On the bottom of the receipt in small writing is "Licensed Agent: World Expert Fund, Berlin-Amsterdam-Tokyo, International License # EC-51G04."  The back of the receipt states, "The European Union Group of Eight is an international lottery cooperation association limited to the members of the European Union only.  Sale of official lottery tickets . . . are licensed to the following

19

organizations:   [1] The Shamrock Agency of Shannon Ireland
. . . ."

     c.   A "Mail Order Request Form" is also included with the solicitations.  On this form are lines to write a credit card number with the expiration date.  The form states that the charge will appear on the bill as "EURO AMERICAN."

     d.   An envelope preaddressed to "PROCESS CENTER, PO BOX 10006, 1001 EA, AMSTERDAM, THE NETHERLANDS."

    15.   Another envelope I opened was postmarked September 5, 2002, from St. Louis, Missouri.  The sender is "WORLD EXPERT-LICENSED AGENT."  In the envelope I saw a letter entitled "A SPECIAL MEMO FROM R.L. DOORNE," which claims to be "electronically transmitted from Berlin."  The letter states, "We have combined and recorded your purchases of fractional tickets in the $250 million 'BUNDERSCHMIDT' 13 Week European Lottery Marathon."  The letter states: "HOW IT ALL WORKS: In the computerized ticket entry system of which our syndicate is a part, only computerized ticket numbers are issued - NO PAPER.  The drawings are done over a 13 week period which began on Saturday, July 6, 2002."  The letter goes on to explain that Enge's ticket has not won but states, " . . . If you are yet to win a prize your ticket will be marked 'Still Valid'."  According to the letter Enge's ticket is marked "Still Valid."  The letter states: "REMEMBER, 30% of all tickets will <u>WIN</u> before the 13

weeks are finished."

16.   I reviewed many other envelopes provided to me from Von Freyman that had solicitations similar to those described above. I saw letters from companies including GLOBAL SEARCH and SHAMROCK AGENCY.

17.   On December 28, 2004, I spoke with Paul Greven, who told me that he has sent checks to EURO AMERICAN to play foreign lotteries.   Greven said he has won only a small amount.   The companies with which he has been involved include the Irish Sweepstakes and EURO AMERICAN.   Greven said, they "make it sound so good and easy to win."   In relation to the solicitations themselves, he said it "makes you trust them. Papers printed is beautifully watermarked."   Greven provided two binders full of documents, which are mostly solicitations, related to the lotteries in which he participated.   Included in the documents were solicitations he received and inquiries he made regarding unpaid winnings.   I reviewed these documents and saw the following:

a.   A letter addressed to Greven stating it is an "Official Announcement of Winning Tickets in the 2003 Irish Sweepstake Triple Crown."   The letterhead indicates it is from "The Shamrock Agency" and claims it has been a "Certified Service since 1959."   The letter states: "Millionaires by the score! We have just finished round one of the verification process of the

21

Triple Crown 118 major Jackpot winning tickets. Enclosed is a list of the winning numbers. Congratulations to the jackpot winners. . . ." The letter informs Greven to be patient for "round 2 of the winning verification process" but encourages him not to ". . . delay in getting the 'Jump' on next year's Triple Crown millions (order form enclosed)." It also states that the Triple Crown is unlike any other lottery because players can be sure there is no ". . .'Inside corruption' or 'secret trick' . . . ." The letter is signed by "Sir William Winfield, Northup Manor, Shannon Ireland."

      b.    Another letter is related to the El Gordo lottery and is from a man named "Wilhelm C. Cashman." The letter claims that Cashman is offering more chances to win by "refunding" his commissions and fees by giving a 25% discount in the cost of additional ticket positions purchased. The end of the solicitation states, "I truly want to see you win big so please let me hear from you right away to allow necessary time for international mail delivery."

      c.    Other solicitations were from OLD AMSTERDAM and MUTUAL MEDICAL. These solicitations start by claiming that Greven won money, which gave him the opportunity to become a member of "our medical mutual Pension insurance Trust." The solicitations claim that by endorsing the $600 bank draft, Greven, ". . . will begin to receive a pension annuity check for

22

the rest of your life . . . ."  At the end of the solicitation

the reader is instructed to endorse the investment draft along

with a "check or M.O. or credit card slip for $112 . . ." and to

make the check payable to "SHAMROCK AGENCY."  A second

solicitation is almost identical, including the graphics, but at

the end instructs the victim to make checks payable to "WORLD

EXPERT".  On one of these solicitations are the words

"International Pension Fund Audit Bureau" encircling the US

Treasury seal.  Another letter for MUTUAL MEDICAL reads,

"Everything appears to be in order and your LIFE INSURANCE is now

in force.  However your first PENSION DIVIDEND in the amount of

$112 has been delayed . . . . The INSURANCE DEPARTMENT has been

unable to VERIFY your BIRTH in the international BIRTH

CERTIFICATE computer database . . . .  If you have a PHOTOCOPY of

youre BIRTH CERTIFICATE at home, we can RELEASE your first

PENSION DIVIDEND immediately upon receiving this document."

      d.   I reviewed copies of two checks drawn from NORTH

AMERICAN PAYMENT made payable to Greven.  One check is dated July

12, 2002, and is for $55, and the other November 30, 1999, and is

for $52.  The 2002 check is from a US Bank account, number

XXXXXXXX1853, in the name of NORTH AMERICAN PAYMENT (as mentioned

in paragraph 22a).  The words, "account closed" are stamped

across the front of the check.

      e.   Greven had other solicitations, including some

from GERMAN SWISS.

18.   I spoke with Special Agent Rodger Keester of IRS-CID, who told me that on August 12, 2005, he interviewed Paul Wood. Wood told him that he has been involved with WORLD EXPERT for about five years. He had played lotteries with them and obtained a form of life insurance from WORLD EXPERT.  Woods stated the insurance from WORLD EXPERT FUND is known as the "Gold Reserve Fund." For this he sends $29 per month to the Netherlands to pay for retirement/life insurance.  Statements he has received show that he has approximately $4,000 in his account.  Wood gave Keester solicitations Wood had received from the companies.  I reviewed these and saw the following:

a.   A letter was postmarked May 27, 2005, from Little Rock, Arkansas.  Inside was a cash rebate grant related to WORLD EXPERT and the German Lottery.  The rebate grant looks like a check from Inter World Bank.  However, on the endorsement section of the check are the sentences, "Do not deposit in US Bank. Return to Berlin for cashing."  The letter states as follows:

"GERMAN GOVERNMENT IS GIVING YOU A ONCE IN A LIFETIME OPPORTUNITY!!  The German Lotto has grown enormously in an extremely short period of time making it one of the RICHEST lotteries offered to people today.  Prize payouts now approximate as much as the equivalent of $915 MILLION U.S. DOLLARS yearly. With such a positive turnover, even under the worst conditions,

you are almost <u>guaranteed to win money</u> by joining this SPECIAL
FUND we've created to invest in this easy to win German Lottery.
**REMEMBER:** This game is NOT stretched out for several months.  You
will receive your prize check in 21 days.  Just fill out the
enclosed green FUND OWNERSHIP CERTIFICATE, mail it back to us,
and <u>within twenty one days you will receive a check for what</u>
<u>could be as much as $658,000 U.S. Dollars</u> as your share of the
total won by this SPECIAL FUND."  The letter goes on to solicit
money: "**REMINDER:** The rules of this promotional cash award
require you to endorse the check and include it along with the
balance of $27,29 and the enclosed $38 ONE PERCENT CERTIFICATE."

     b.    Also in the letter is a gold sticker that claims
to be a seal from the "ELBC, European Lottery Brokers
Commission," which "certifies your purchase is authentic and
insured from fraud. . . ." When asked about this seal Woods told
Keester the seal represented that the venture was legitimate.

    19.  On March 27, 2006, I spoke with SA Karlous of the IRS-
CID who told me that on that date he interviewed Betty Bedwell.

     a.    Bedwell told SA Karlous that she has received
mailings from SHAMROCK AGENCY, EURO FUND, and OLD AMSTERDAM.  She
has written checks to each company except Euro Fund.  When
writing a check to Euro Fund she makes it payable to WORLD EXPERT
FUND.  Bedwell told Karlous that she received checks from EURO
AMERICAN PAYMENT on behalf of WORLD EXPERT, Berlin, Germany, but

25

was encouraged to and did reinvest the checks by mailing them back to the Netherlands.  Bedwell told Karlous that she believed she was playing a foreign lottery that actually had a chance of winning.  She was encouraged to continue sending money by the stories of people winning told in the solicitations.  Bedwell said that her check #104 that she paid to OLD AMSTERDAM was to establish a pension that she could leave as an inheritance for her grandchildren.  Bedwell would not have sent money if she knew that money was not being used for its intended purpose.

b.   Bedwell provided SA Karlous with a letter regarding the pension.  The letter, which was signed by "Lee Ping, Secretary Treasurer," has a heading that states: "OLD AMSTERDAM GOLD RESERVE MUTUAL PENSION POOL, Established in 1957." The letter states in part the following: "As Secretary Treasurer it is my great pleasure to inform you that your application for PENSION POOL membership has been approved by the BOARD OF DIRECTORS.  As a new MEMBER you will soon receive your first PENSION DIVIDEND CHECK.  But first it is important that you review the enclosed information carefully and NAME the person who is to be your Beneficiary. . . .  Just follow the instructions on the back of your INSURANCE POLICY.  This special insurance is FREE to all members and will give your BENEFICIARY a MINIMUM amount of money regardless of the balance in your TRUST DEPOSIT ACCOUNT.  As a Certified Public Accountant I have reviewed many

26

good pension plans over the years and I find that this particular one is quite advantageous - especially for people who live in countries where the tax authorities use PROBATE as an excuse to collect heavy fees and taxes from Beneficiaries.  Such unpleasantness can be avoided under our program.  Any money in your TRUST ACCOUNT goes to your BENEFICIARY without the difficulty of a WILL or the intrusion of tax authorities.  This means more money for your BENEFICIARY and, perhaps most important, PEACE OF MIND for both you and your Beneficiary."

c.    I saw that included in a deposit dated September 12, 2005, to a bank account, number XXXXXX4990 at Citibank, a check from victim Betty Bedwell made payable to WORLD EXPERT for $120.

d.    I saw that included in a deposit dated July 15, 2004, to a bank account, number XXXXX8795 at Encino Bank, was a check from victim Betty Bedwell made payable to OLD AMSTERDAM for $500.

<u>Bank Account Information</u>

20.  My investigation to date has located nearly twenty bank accounts controlled by the conspirators.  I have reviewed records of those account and learned that between January 1, 2001, and April 2006, deposits into those accounts have totalled at least $30 million.  Based on the names of the accounts, they all appear to be related to the scheme.  However, due to the volume of