# EXHIBIT D

## AFFIDAVIT IN SUPPORT OF THE REQUEST
## FOR EXTRADITION OF WILLIAM CLOUD

I, Timothy Nugent, being duly sworn, state as follows:

1.      I am a citizen of the United States and a resident of the State of California.

2.      I am a Special Agent with the Internal Revenue Service's Criminal Investigation Division (IRS-CID), and have been so employed since 1994. I have received extensive training in white collar offenses such as mail fraud, wire fraud, money laundering, and tax evasion, including specific training in the identification and investigation of frauds known as Ponzi schemes, involving elderly victims. I have been involved in many investigations of this type. I have also been involved in more than a hundred investigations of financial crimes.

3.      My duties as an IRS-CID Special Agent include participation in the investigation of WILLIAM CLOUD in the case of United States v. WILLIAM CLOUD, et al., Case. No. CR 07-134. As a case agent in this investigation, I have become familiar with the facts of the investigation involving the criminal activity of CLOUD.

4.      WILLIAM CLOUD is charged in an indictment filed in the United States District Court for the Central District of California on February 28, 2007, with numerous counts of fraud and money laundering.

5.      A joint investigation involving the IRS-CID and the United States Postal Inspection Service (USPIS) revealed that from at least 1990 through July 2006, WILLIAM CLOUD, Sonny Vleisides, James Ray Houston, Dennis Emmett, Henry Walther, Scott Henry Walther, and others committed a massive international lottery scam using the following company names: Shamrock Agency, German Swiss Group, World Expert Fund, Mutual Medical Insurance Co, Old Amsterdam Trust Co, Euro American Fax Co, European Union Commission, EU American Payment Co, Global Search Network, North American Foreign Payments Services, Worldwide Verification Service, and others. Vleisides ran the scheme along with Houston and Emmett. Vleisides, Houston, and

Emmett, who were located in Costa Rica, worked with mailing houses which, at the direction of Vleisides, Houston, and Emmett, sent out tens of thousands of mailings to victims in the United States, many of whom were elderly.  The mailings contained false statements, partial truths, and omissions, and induced the victims to participate in various international lotteries, falsely stating that if the victims participated, they were guaranteed to win or had a very good chance to win.  The mailings directed the victims to send their money to Ireland and the Netherlands, among other locations, where CLOUD had set up commercial mail receiving agencies and individuals to forward the money, eventually, back to the United States.  CLOUD also set up the process whereby victims could pay via credit cards.  CLOUD forwarded the victims' money to Henry Walther, who, along with his son Scott Henry Walther, deposited the money into various bank accounts and then distributed it as directed by Vleisides, Houston, and Emmett.  Some of the money was spent on furthering the criminal activity.  Some of the money was paid out to victims in small-dollar checks that the co-schemers misrepresented to be lottery winnings.  The rest of the money was paid out to the co-schemers and others for their own use.  CLOUD and the other defendants did not buy any lottery tickets, and the vast majority of the victims lost the money they sent.  The total loss from the scheme is in excess of $19 million.

6.      I have spoken with the other case agents and reviewed the evidence collected during the investigation, including agent reports of victims and participants in the scheme, and evidence seized from several search warrants executed in the United States in July 2006.

Victims

7.      Many victims of the scheme and their family members were interviewed. Some typical examples of the way in which the scheme operated are as follows:

8.      Clarence Enge

a.      Clarence Enge, who is in his 80s, received scores of letters from companies soliciting his participation in foreign lotteries.  Since 1997, Enge had sent

2

$600-$1200/month to such companies, including to OLD AMSTERDAM and SHAMROCK AGENCY.  In order to continue his participation he refinanced his home.

b.      One letter from World Expert Fund-Licensed Agent, addressed to Enge, was postmarked from Little Rock, Arkansas, dated "13 Jun 2002."  The envelope contained:  A colorful solicitation for "The Giant Bunderschmidt," which contained phrases like:   "Almost every third number wins in the 8th annual Bunderschmidt European Lottery Marathon;" "Win big with as little as 1 a week!", "A grand total of $251,548,908 in prizes. Add to this all the promotional prizes involved, and you have an unprecedented Quarter Billion Dollar European lottery bonanza," "A full 30% of all tickets will win!," "Official European Lottery," "WORLD EXPERT FUND-BERLIN GERMANY Bunderschmidt-Licensed Agent," "Make checks payable to World Expert Fund."

c.      Also included were two "official receipts" for the "Euro Cities Capital 7 game."  This official receipt provided a "ticket ID number" and stated that: "This is your official receipt for 30 consecutive days in the Euro-Cities Capital 7 game.  Your numbers are shown in the windows above.  Prizes will be paid in US dollars and checks will be mailed to you within 10 days by the licensed agent drawn on a U.S. Bank."  On the bottom of the receipt in small writing was "Licensed Agent: World Expert Fund, Berlin-Amsterdam-Tokyo, International License # EC-51G04."  The back of the receipt stated, "The European Union Group of Eight is an international lottery cooperation association limited to the members of the European Union only.  Sale of official lottery tickets . . . are licensed to the following organizations:  [1] The Shamrock Agency of Shannon Ireland . . . ."

d.      A "Mail Order Request Form" was also included with the solicitations. On this form were lines to write a credit card number with the expiration date.  The form stated that the charge would appear on the bill as "EURO AMERICAN."

e.      An envelope preaddressed to "PROCESS CENTER, PO BOX 10006, 1001 EA, AMSTERDAM, THE NETHERLANDS."

f.     Another envelope was postmarked September 5, 2002, from St. Louis, Missouri. The sender was "WORLD EXPERT-LICENSED AGENT." The envelope contained a letter entitled "A SPECIAL MEMO FROM R.L. DOORNE," which claimed to be "electronically transmitted from Berlin." The letter stated, "We have combined and recorded your purchases of fractional tickets in the $250 million 'BUNDERSCHMIDT' 13 Week European Lottery Marathon." The letter stated: "HOW IT ALL WORKS: In the computerized ticket entry system of which our syndicate is a part, only computerized ticket numbers are issued - NO PAPER. The drawings are done over a 13 week period which began on Saturday, July 6, 2002." The letter goes on to explain that Enge's ticket had not won but stated, " . . . If you are yet to win a prize your ticket will be marked 'Still Valid'." According to the letter Enge's ticket was marked "Still Valid." The letter stated: "REMEMBER, 30% of all tickets will <u>WIN</u> before the 13 weeks are finished."

9.     <u>Paul Wood</u>

a.     Paul Wood stated had been involved with WORLD EXPERT for about five years. He had played lotteries with them and obtained a form of life insurance from WORLD EXPERT. Woods stated the insurance from WORLD EXPERT FUND was known as the "Gold Reserve Fund." For this he sent $29 per month to the Netherlands to pay for retirement/life insurance. Statements he had received showed that he had approximately $4,000 in his account.

b.     Some of the solicitations Wood received were the following:

i.     A letter was postmarked May 27, 2005, from Little Rock, Arkansas. Inside was a cash rebate grant related to WORLD EXPERT and the German Lottery. The rebate grant looked like a check from Inter World Bank. However, on the endorsement section of the check were the sentences, "Do not deposit in US Bank. Return to Berlin for cashing." The letter stated as follows: **"GERMAN GOVERNMENT IS GIVEN YOU A ONCE IN A LIFETIME OPPORTUNITY!!** The **German Lotto** has grown enormously in an extremely short period of time making it one of the RICHEST lotteries

4

offered to people today.  Prize payouts now approximate as much as the equivalent of **$915 MILLION U.S. DOLLARS** yearly.  With such a positive turnover, even under the worst conditions, you are almost <u>guaranteed to win money</u> by joining this SPECIAL FUND we've created to invest in this easy to win German Lottery.  **REMEMBER:** This game is NOT stretched out for several months.  You will receive your prize check in 21 days.  Just fill out the enclosed green FUND OWNERSHIP CERTIFICATE, mail it back to us, and <u>within twenty one days you will receive a check for what could be as much as</u> **<u>$658,000 U.S. Dollars</u>** as your share of the total won by this SPECIAL FUND."  The letter went on to solicit money: "**REMINDER:** The rules of this promotional cash award require you to endorse the check and include it along with the balance of $27,29 and the enclosed $38 ONE PERCENT CERTIFICATE."

          ii.     Also in the letter was a gold sticker that claimed to be a seal from the "ELBC, European Lottery Brokers Commission," which "certifies your purchase is authentic and insured from fraud. . . ." Wood believe the seal represented that the venture was legitimate.

<u>Non-Victim Witnesses</u>

      10.    A number of non-victim witnesses were also interviewed.  As an example, when interviewed, Michael Bolger stated that Unit C12 Smithstown Industrial Estate (same address from which lottery letters were sent to victim Enge) was a mailing address he operated for a lottery based in the United States called the SHAMROCK AGENCY.  The SHAMROCK AGENCY also used a mailing address in Limerick, Ireland and the address of 43 Cill Chais, Shannon, Co Clare, Ireland.  Bolger collected the mail at the mailing addresses and then forwarded it in a sack to an address in Holland.  Bolger received payment for his forwarding via Western Union.  As far as Bolger knew, the people who operate the business in the United States were WILLIAM CLOUD and Scott Henry Walther.

      11.    Interviews were conducted in Amsterdam, pursuant to the Mutual Legal

Assistance Treaty, relating to the addresses there to which victims had sent money for the lottery.  Bernhard van Kleef stated that he rented a room to a man named Thomas McGovern, who received mail there under the business name World Wide Expert.  He met McGovern through WILLIAM CLOUD, who owned a bar called Flying Dutchmen and also owned the business World Wide Expert.  Van Kleef also said that he worked for CLOUD as a chauffeur, picking up bags of mail that CLOUD took home and sorted.  When interviewed, William Finlayson stated that in 2001, CLOUD rented a postbox from him.  CLOUD told him that he had a business named World Wide Express or possibly Expert that had something to do with lotteries.  He explained that people sent CLOUD checks and he filed Lotto numbers.

12.     PJ Swink stated that her company, Western Internet, worked for Vleisides.  The work PJ Swink did for Vleisides included printing as well as stuffing and mailing envelopes.  Vleisides gave her instructions regarding the preparing, printing, and mailing of the solicitations.  Western Internet had done this work for Vleisides, or his father, "Rex Rogers," since 1993.  Since 2000, all of the work PJ Swink had done for Vleisides and "Rex Rogers" had been related to the lottery.  PJ Swink identified some of the letters described in the victim section above as items she had printed and prepared for mailings upon Vleisides' direction.  Vleisides sent PJ Swink the printing directions for the mailings along with specific directions on how to mail the items.  Vleisides told PJ Swink that if the solicitations were mailed from a larger city it increased the chance of the recipient opening the envelope.  PJ Swink was instructed to find someone to take the mail to these larger cities for postmark.  Vleisides and Henry Walther told PJ Swink and her husband, Michael Swink, that the mailings were legitimate.  PJ Swink regularly sent samples of the solicitations to Henry Walther, as an attorney, to make sure that what they were mailing was not illegal.  PJ Swink was always reimbursed for work by either CLOUD or Henry Walther.

13.  Mary MacRae worked for Euro American Fax Co. in Austell, Georgia, for

6

nearly five years. She was hired by CLOUD, who she knew was the owner of Euro American Fax Co. McRae was responsible for inputting credit card charges from numbers provided to her via email by CLOUD. She was told by CLOUD that these numbers were "plays" for lotteries. Another part of her responsibilities included paying the expenses of Euro American Fax, which included wiring money to Michael Bolger in Ireland, who was part of CLOUD's lottery business. She has also wired money to "Sonny" per CLOUD's instructions. CLOUD also gave her instructions to send checks from Euro American Fax Co. to Hank, whose legal name is Henry Walther. These checks were to be made payable to "Henry Walther Attorney at Law." McRae believed the name World Expert was the name of one of the lotteries associated with CLOUD's business. CLOUD lived in Amsterdam where he owned a bar.

14.   Henry Walther, who has pled guilty to mail fraud and money laundering, explained that the main people involved in the lottery were James Ray Houston, Sonny Vleisides, and Dennis Emmett. CLOUD is Houston's brother, or half-brother, and Vleisides' uncle. Walther worked as an accountant/banker and attorney for Vleisides and Houston, who resided in Costa Rica and operated a mail solicitation business involving foreign lotteries and horse racing. Two of the companies they use were The Shamrock Agency and World Expert Fund. Houston and Vleisides instructed Henry Walther to open and maintain bank accounts in the United States because the banking system was too slow in Costa Rica. Walther received DHL and Fed Ex packages from Costa Rica and Amsterdam full of checks for deposit into U.S. bank accounts. The packages from Amsterdam came from WILLIAM CLOUD. Walther said he knew that these checks were from individuals playing the lottery.

15.  Glenda Emmet was the owner of Astro Computer, which operated a mail list business. For five or six years, her only customer was Global Search Network, which was run by her ex-husband, Dennis Emmett. Dennis Emmett is now in prison in Costa Rica for murder, but was still issuing instructions to her from prison. Before she worked

7

for Global Search Network, she worked for World Expert Fund. That company was owned by Vleisides. Dennis Emmett, worked with World Expert Fund for some time in Costa Rica. Henry Walther was also involved with World Expert Fund. After working for Vleisides and World Expert Fund, Dennis Emmett started working for Global Search Network. The solicitation letter Dennis Emmett used for Global Search Network was originally provided by Vleisides for World Expert Fund. Responses to the solicitations were sent to Amsterdam. After being sent to Amsterdam, checks sent in response to the solicitations were sent to Henry Walther. CLOUD was the contact person in Amsterdam.

<u>Bank Record Evidence</u>

16. The victims' money was first deposited into accounts established by the co-schemers at numerous banks in accounts with names that sound like official lotteries: SHAMROCK AGENCY, WORLD EXPERT, OLD AMSTERDAM, GERMAN SWISS, and EUC. (Hereinafter, accounts at this first layer will be referred to as "Deposit Accounts.") The co-schemers obtained over $19 million from tens of thousands of victims and deposited them into these accounts. After the co-schemers deposited the victims' money into the Deposit Accounts, they transferred the money to the next layer of accounts, hereinafter referred to as "Payment Accounts." These accounts were in names that included NORTH AMERICAN PAYMENT and EU PAYMENT SERVICE. From the Payment Accounts, the co-schemers wrote checks represented as winnings and sent them back to the victims. The amount of the alleged "winnings" was far less than the amount the victims sent in – for the over $19 million going into the accounts from victims, only approximately 20% was sent back to victims in the form of "winning" checks. The co-schemers transferred some of the money from the Deposit Accounts and Payment Accounts to the next layer of accounts, which will hereinafter be referred to as "Syphon Accounts." The co-schemers wrote checks (or used wire transfers) from the Lottery Accounts and the Payment Accounts to the Syphon Accounts, which were in names that included WESTERN INTERNET, BUTTERFIELD, CARNEGIE and HENRY WALTHER

8

ATTORNEY WIRE ACCOUNT.  Money from the Syphon Accounts was used to continue the scheme by paying scheme expenses, as well as to provide benefits to the co-schemers.  The co-schemers also took money at each layer in the form of checks to cash, checks to themselves, or checks to the payment of personal or scheme expenses.  There were no payments going toward the purchase of lottery tickets.

17.  The transactions described in the money laundering counts were made from accounts into which the proceeds of the fraud were deposited, and furthered the scheme.  As an example, checks written to Western Internet Specialty Group were payments to PJ and Michael Swink for the mass mailing of fraudulent lottery letters.  The checks written to Mail Distribution Center were payments to Herb Madsen, who also performed mass mailings of fraudulent lottery letters for the co-schemers.  Checks to Astro Computer Service were to Glenda Emmett for mailing of fraudulent lottery letters and computer services relating to victim lists.

18.  Bank records for the Euro American Fax bank account at Georgia State Bank show that the account was opened in 2003 by CLOUD and McRae.  In the account were regular and frequent electronic deposits totaling over $1,000,000 from credit card merchant processing companies, which appear to be moneys from victims paying for the fraudulent lottery by credit card.  Nine checks made payable to cash, with dates from April 2004 through August 2004, that had "Sonny" written in the memo section.  The nine checks for this four-month period totaled $16,565.  Other checks included nearly $200,000 made payable to the Henry Walther Wire Attorney Wire Account.  These checks appeared to have been signed by CLOUD.

19.  Bank records for the Henry Walther Wire account showed regular wires, in amounts ranging from $7,500 to $9,500, being sent to a bank account in Amsterdam in the name of CLOUD.

Search Warrant Evidence

20.  On July 6, 2006, several search warrants were executed at addresses in

California, Georgia, and Missouri.  The searches yielded substantial evidence, including e-mails among the co-schemers, supporting the fraud and money laundering schemes; thousands of credit card "Mail Order Forms" that listed names and credit card numbers; Western Union receipts; completed "Mail Order Request Forms" containing authorizations to charge credit cards; instructions for how to print and prepare solicitations for mailing, with titles including "Irish Sweepstakes," "El G Payout," "Bundershmidt," "Medical Dividends Payout," and "RL Doorne."  One e-mail from WILLIAM CLOUD stated, "Here are two set's addresses that will rotate every 6 weeks."  The addresses were all in Amsterdam and appeared to be mail drops in Amsterdam from WILLIAM CLOUD.  There were also solicitations to thousands of individuals all over the United States that had been prepared and were ready to be mailed.  These solicitations were in various stages of completion.

21.   WILLIAM CLOUD is a white male, who is 6 feet, 2 inches tall and was last known to weigh approximately 220 pounds.  He was born on January 8, 1950, in Kansas City, Missouri.  He has brown hair and green eyes.  He was issued a United States passport, number 155853472.

22. Mary MacRae has identified the male in the photograph attached as Exhibit 1 to this affidavit as being a photograph of the same WILLIAM CLOUD who participated in the fraudulent lottery scheme discussed in this affidavit.

_____
Timothy Nugent, Special Agent
Internal Revenue Service –
Criminal Investigations Division

Sworn to and subscribed before me this ___7___ day of May, 2007

_____
HONORABLE SUZANNE H. SEGAL
United States Magistrate Judge

10